# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MARIA GARLICK, as Administratrix | : | No.: 4:12-CV-01166 |
| of the Estate of GEORGE B. GARLICK, | : | |
| III, and in her own right, | : | (Judge Brann) |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| ANADARKO PETROLEUM | : | |
| CORPORATION, ANADARKO | : | |
| ENERGY SERVICES COMPANY, | : | |
| ANADARKO E & P COMPANY LP, | : | |
| and ANADARKO MARCELLUS | : | |
| MIDSTREAM, LLC, | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM OPINION

### AUGUST 15, 2017

This case is a tragedy in search of a cause of action. Plaintiff's decedent, George "Bart" Garlick, died in the dark of night when the water truck he was driving missed a turn-off, travelled in the wrong direction for nearly three miles, failed to navigate a curve, and tumbled down a nearby embankment. As unfortunate as that is, however, Plaintiff's retrospective efforts to wind the clock back and discern the true cause of the driver's accident have proven fruitless, even after five years of litigation. Without question, I have come to realize that the facts of this case are as steeped in misfortune as they are shrouded in mystery.

Indeed, Plaintiff's efforts seem to rival what futility Erwin Schrödinger must have felt when he hypothesized long ago about the paradoxical box that contained his now famously inconclusive cat. That is to say, the causal thought experiment that still permeates this case at its twilight, among other shortcomings, is fatal to its continued vitality. Because the Plaintiff has failed, as a matter of law, to adduce sufficient evidence on a number of requisite elements, I will grant summary judgment in Anadarko's favor. Otherwise, a trial in this matter would amount to a guessing game based on pure speculation and naked conjecture—a method of assigning fault that our judicial system plainly does not countenance.

## I. BACKGROUND

This case's shadowy scene was perhaps best set by Plaintiff's own counsel, David L. Kwass, Esquire, during his oral argument before the United States Court of Appeals for the Third Circuit. As Mr. Kwass described:

> On May 16, 2012, at 2:20 in the morning, an inexperienced truck driver driving in the wilderness, in the mountains in rural Pennsylvania, crashed and died. . . . On this evening, which was the very first time that Mr. Garlick had been assigned to drive this particular route, having only three weeks of experience driving these baby bottle trucks, Mr. Garlick missed a turn at Beach Creek Mountain Road [and] continued past the designated route.[1]

The decedent was employed as a truck driver by Trans Tech Logistics, who leased its vehicles to QC Energy Resources. Am. Compl., ECF No. 59, at ¶ 15;

---

[1] http://www2.ca3.uscourts.gov/oralargument/audio/14-4186Garlickv.TransTech.mp3 at 0:37–2:15.

*Garlick v. Trans Tech Logistics, Inc.*, 636 F. App'x 108, 110 (3d Cir. 2015) (per curiam). QC Energy then contracted with Anadarko to supply water to natural gas drilling sites. Pl.'s Br. in Opp'n to Defs.'Mot. for Summ. J., ECF No. 128, at 2 (hereinafter "Pl.'s Br."). The truck involved in the accident was owned and maintained at all times by QC Energy, not Anadarko. Am. Compl. ¶ 16. The truck driver had no direct employment or contractual relationship with Anadarko, who was merely a client of one of his employer's clients.

With the assistance of local and state government officials, Anadarko provided QC Energy with a booklet containing directions to each of its 48 well pads. Pl.'s Br. at 3. QC Energy then distributed the booklets to all contracted Trans Tech Logistic drivers. *Id.* The routes listed on the directions led from water sources to the drilling sites and vice versa. *Id.* at 2–3. The directions to the drill site involved in the instant matter appear at Figure 1 on the following page:

## Figure 1. Directions to Drilling Site

```
FROM I80, TAKE SNOWSHOE EXIT 147 ONTO HWY 144 NORTH, GO 0.1 MILES
TURN LEFT ON HWY 144, GO 3.6 MILES.
TURN RIGHT ON HWY 144, GO 22.2 MILES.
TURN RIGHT ON BEECH CREEK ROAD, GO 5.3 MILES
TURN LEFT ON EAGLETON ROAD, GO 1.8 MILES
TURN LEFT ON DISHPAN HOLLOW ROAD, GO 0.3 MILES
TURN LEFT ON LEASE ROAD, GO 0.2 MILES TO LOCATION ON RIGHT
9-1-1 ADDRESS: 925 EAGLETON ROAD
```

An Anadarko designee explained that in compiling the above route, the company "would work with any local or municipal stakeholders to determine the most efficient and safest route into a facility." Dep. of Jeffrey Lorson, ECF No. 128-7, at 80:07–10. Anadarko made no further promises, representations, or undertakings in relation to third-party drivers who supplied its sites with water. Moreover, there is no indication in the record that QC Energy's contracted drivers were required to follow the directions that Anadarko supplied; that the directions constituted anything other than suggested routes compiled by Anadarko's drilling team with the assistance of local government authorities; or that the drivers or their immediate employers were forbidden from supplementing the directions with additional directional tools, such as maps or GPS devices. *See id.* at 81:10–24.

The parties do not dispute that the directions set forth at Figure 1 were wholly accurate and that the driver, approximately 2.5 miles before he crashed, missed the right-hand turn-off onto Beech Creek Road, which turn-off was clearly listed on the directions sheet that Anadarko had supplied. Neither is it contested

that the road on which the driver was travelling was a state route and the road that he would have entered immediately upon making the turn-off was a Pennsylvania Department of Conservation and Natural Resources (DCNR) road, both of which were owned and maintained at all times by the state government, never by Anadarko. Tr. of July 11, 2017 Oral Arg. at 59:01–06 (hereinafter "July 2017 Tr.").

On the night in question, the driver had only been working for QC Energy for approximately three weeks. July 2017 Tr. at 21:02–09. In fact, he had no prior experience driving so-called "baby bottle" trucks, and the record even reflects that he may have been untruthful about his lack of prior experience on hiring documents that he supplied to QC Energy. *See* ECF No. 124 at 2.[2]

The driver began working a 12-hour shift at 6:00 p.m. on May 15, 2012, the night of the accident, in Renovo, Clinton County, Pennsylvania. Defs.' Br. in Supp. of Summ. J., ECF No. 127, at 8 (hereinafter "Defs.' Br."). As Mr. Kwass represented at oral argument before the Third Circuit, the night in question was the first night on which the driver had travelled to this particular drilling site.

---

[2]   Indeed, certain representations have been made suggesting that the only reason why the driver's inexperience had not been discovered earlier was because he had been with QC Energy for such a short period of time that he had not yet reached his first probationary review. Regardless of its veracity, I note this only because the question of whether QC Energy breached its contractual obligations to Anadarko by failing to supply adequately experienced and trained drivers under the parties' agreement and therefore could be liable to Anadarko in an indemnification action or otherwise appears to be an open question at the time of this writing.

Importantly, however, the fatal trip was not his first trip to the drilling site that night. To the contrary, it is undisputed that at approximately 10:30 p.m. that evening, the driver successfully traveled from a water source to the very same drilling site and back to the water source immediately prior to commencing his fatal trip. Defs.' Br. at 9. It is believed that the driver did not miss the turn-off during his first trip or otherwise report any directional difficulties reaching the drill site at that time. *Id.* In fact, at oral argument before this Court, his counsel, Thomas G. Oakes, II, Esquire, admitted that the odometer readings showed that no excess mileage was accumulated during the driver's first trip. July 2017 Tr. at 45:20–46:01.

At approximately 2:20 a.m., on his second trip to the drill site that night, the driver missed the turn-off onto Beech Creek Road. Pl.'s Br. at 3. After he missed the turn-off, the driver continued down State Route 144 in the wrong direction for nearly three miles. Defs.' Br. at 8. Nothing in the record suggests that the driver had realized his mistake and had attempted to turn the truck around. Instead, it appears that his truck crashed while still travelling in the wrong direction when its speed and the weight of the water prevented it from successfully navigating a curve in the road. Pl.'s Br. at 1. At that time, it is believed that the truck's brakes failed, the driver lost control of the truck, and the truck collided with a nearby guardrail.

*Id.* Unfortunately, the guardrail did not stop the truck, and the truck toppled down a nearby embankment, at which point the driver sustained fatal injuries. *Id.*

Despite that tragedy, the Plaintiff has adduced no evidence establishing that Anadarko's actions or omissions in any way caused the driver to miss the turn on his second trip or to ultimately leave the roadway. As Anadarko has pointed out in its briefing and at oral argument, on the present record, its acts or omissions were no more likely to have caused the driver to miss the turn and crash his truck than: the driver's own fatigue; distraction by radio chatter; the darkness or the weather; the driver's misreading or miscalculating the directions; his own decision to stop following the directions; top heaviness from sloshing water within the bed of the truck; distraction by a cell phone or food; his speeding; mechanical failure of the truck; or an animal or vehicle passing by or intruding into the driver's lane. In fact, because the driver was using the same directions on both trips and because those directions were accurate, it would appear more likely that some external cause or chance event not attributable to Anadarko precipitated the missed turn and eventually, the accident.

Even more, subsequent events that undoubtedly contributed to the ultimate crash also complicate Plaintiff's attempt to show causation. In fact, Plaintiff's own briefing admits that after the driver departed from the prescribed route, "the brakes on his QC Energy water tanker failed," and he became unable to navigate turns.

Pl.'s Br. at 1. The amended complaint, filed in November 2013 confirmed that the driver "experienced brake failure and lost directional control of the truck." Am. Compl., ECF No. 59, at ¶ 17. Based on those purported facts, the amended complaint alleged that the QC Defendants "were negligent [in] failing to perform routine maintenance on the subject truck"; in "failing to provide [the driver] with a truck that was in 'fit for service' condition"; and in "failing to properly train [the driver] to operate the subject truck safely in the weather and road conditions which existed at the time of the accident." *Id.* ¶ 20.

On November 25, 2014, I adopted a Report and Recommendation by United States Magistrate Judge William I. Arbuckle, III, which granted summary judgment in favor of QC Energy on the ground that it was entitled to immunity under the Pennsylvania Worker's Compensation Act as the driver's statutory employer. 2014 WL 11395012 (adopting 2014 WL 11395241 (M.D. Pa. Sept. 29, 2014)). That Report and Recommendation also granted summary judgment in favor of Anadarko on the sole ground that Anadarko did not owe the driver a duty under either § 323 (Negligent Performance of an Undertaking to Render Services) or § 343(Dangerous Conditions Known or Discoverable by Possessor) of the Restatement (Second) of Torts. At that time, Anadarko had not moved for summary judgment on the basis of causation, and the § 323 issue was itself admittedly a tertiary issue in the parties' appellate briefing.

On December 18, 2015, in a non-precedential per curiam opinion, the Third Circuit affirmed my grant of summary judgment in favor of QC Energy but reversed as to Anadarko, remanding the case for further proceedings before this Court. *Garlick v. Trans Tech Logistics, Inc.*, 636 F. App'x 108 (3d Cir. 2015). Anadarko has filed a motion for summary judgment in which it argues that, as a matter of law, Plaintiff has not shown that Anadarko breached a duty of reasonable care that proximately caused the driver to depart from the directions and crash his water truck. I received briefing and conducted oral argument on the motion. Because the applicable law, as it would appear in any jury charge, requires that judgment be entered in favor of Anadarko, that motion is granted consistent with the foregoing discussion.

## II. LAW

"One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Facts that could alter the outcome are 'material facts,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of

the person with the burden of proof on the disputed issue is correct." *Clark v.*
*Modern Grp. Ltd.*, 9 F.3d 321, 326 (3d Cir. 1993) (Hutchinson, J.) (citing
*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) and *Celotex*, 477 U.S. at
322).

"A defendant meets this standard when there is an absence of evidence that
rationally supports the plaintiff's case." *Clark*, 9 F.3d at 326. "A plaintiff, on the
other hand, must point to admissible evidence that would be sufficient to show all
elements of a *prima facie* case under applicable substantive law." *Id.*

"[T]he inquiry involved in a ruling on a motion for summary judgment or for
a directed verdict necessarily implicates the substantive evidentiary standard of
proof that would apply at the trial on the merits." *Liberty Lobby, Inc.*, 477 U.S. at
252. Thus, "[i]f the defendant in a run-of-the-mill civil case moves for summary
judgment or for a directed verdict based on the lack of proof of a material fact, the
judge must ask himself not whether he thinks the evidence unmistakably favors
one side or the other but whether a fair-minded jury could return a verdict for the
plaintiff on the evidence presented." *Id.* "The mere existence of a scintilla of
evidence in support of the plaintiff's position will be insufficient; there must be
evidence on which the jury could reasonably find for the plaintiff." *Id.* "The
judge's inquiry, therefore, unavoidably asks . . . 'whether there is [evidence] upon
which a jury can properly proceed to find a verdict for the party producing it, upon

whom the onus of proof is imposed.'" *Id.* (quoting *Schuylkill & Dauphin Imp. Co. v. Munson*, 81 U.S. 442, 447 (1871)). Summary judgment therefore is "where the rubber meets the road" for a plaintiff, as the evidentiary record at trial, by rule, will typically never surpass that which was compiled during the course of discovery. "In this respect, summary judgment is essentially 'put up or shut up' time for the non-moving party." *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006) (Fisher, J.).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323 (internal quotations omitted). "[R]egardless of whether the moving party accompanies its summary judgment motion with affidavits, the motion may, and should, be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Id.*

Where the movant properly supports his motion, the nonmoving party, to avoid summary judgment, must answer by setting forth "genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Liberty Lobby*, 477 U.S. at 250. For movants and

nonmovants alike, the assertion "that a fact cannot be or is genuinely disputed" must be supported by: (i) "citing to particular parts of materials in the record" that go beyond "mere allegations"; (ii) "showing that the materials cited do not establish the absence or presence of a genuine dispute"; or (iii) "showing . . . that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

"When opposing summary judgment, the non-movant may not rest upon mere allegations, but rather must 'identify those facts of record which would contradict the facts identified by the movant.'" *Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 233 (3d Cir. 2003) (Weis, J.). Moreover, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e)(2). On motion for summary judgment, "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby,* 477 U.S. at 249. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a

jury to return a verdict for that party." *Id.* "If the evidence is merely colorable . . . or is not significantly probative, summary judgment may be granted." *Id.* at 249–50 (internal citations omitted).

## III. ANALYSIS

Both on appeal and before this Court, the Plaintiff has attempted to divorce § 323 from principles of ordinary negligence—taking certain elements of each cause of action when they most suit her, while willfully forgetting other parts. In particular, § 323 requires both that the defendant undertake to render a particular service to the plaintiff and that the plaintiff's injuries be caused by its reliance on the defendant's provision of that particular service.

The only undertaking here—to the extent that it even can be called that— was Anadarko's providing directions to QC Energy. Anadarko undertook to provide no further assurances, and the driver here could never have, as § 323 requires, relied upon precautions that Anadarko never previously undertook to supply him. Thus, to the extent that Plaintiff argues that Anadarko should have provided more than accurate directions alone, that contention falls well beyond § 323's scope.

Moreover, § 323, like ordinary negligence, imposes a duty of reasonable care and nothing more. When asked at oral argument how exactly Anadarko breached a duty of reasonable care if its directions were accurate and were

sufficient to guide the driver to the site on one occasion, Mr. Oakes, following the lead of Mr. Kwass's oral argument before the Third Circuit, answered that Anadarko's duty required it to install lighting and signage on a state-owned road and place a flagman at the intersection in the dark of night. July 2017 Tr. at 16:05–25. That answer not only conflicts with decades of established Pennsylvania law that reserves to the state the obligation of maintaining state-owned roads, but it also would effectively impose a duty of absolute care on Anadarko.

Seeming to recognize those shortcomings, Plaintiff's counsel raised a novel, unpled theory for the first time during oral argument before the Third Circuit. There, Mr. Kwass argued that § 323 required Anadarko not only to erect signs and lights but to provide "the safest route possible." Plaintiff has never pled such a grandiose theory—and for good reason. It would have been dismissed at the earliest of stages. Neither ordinary negligence nor § 323 imposes strict liability when an injury occurs, and that is precisely what this novel theory seeks. Further, because discovery has never been conducted on such a theory, it lacks any supporting evidence whatsoever to survive the summary judgment stage.

Finally, all potential sources of negligence involved here require that a defendant's acts or omissions be the proximate cause of the plaintiff's injuries. As will be demonstrated more fully below, Plaintiff's bare-bones allegations at the summary judgment stage fall well short of satisfying that element as a matter of

law. Indeed, not only is it unclear that Anadarko's alleged omissions in any way contributed to the missed turn and the ultimate crash, the record is littered with a number of intervening causes, including driver error and brake failure, that destroy whatever miniscule causal showing the Plaintiff has made.

As such, I will grant Anadarko's motion for summary judgment based on each of the independent grounds that follow.

**A.  Anadarko Is Entitled To Summary Judgment As A Matter Of Law Because Even Assuming That § 323 Applies To This Case, And Its Application Is Dubious, Plaintiff Has Not Adduced Sufficient Facts Showing That Anadarko Breached A Duty Of Reasonable Care Under That Provision Or Otherwise.**

"The necessary elements to maintain an action in negligence are: a duty or obligation recognized by the law, requiring the actor to conform to a certain standard of conduct; a failure to conform to the standard required; a causal connection between the conduct and the resulting injury and actual loss or damage resulting to the interests of another." *Morena v. S. Hills Health Sys.*, 501 Pa. 634, 462 A.2d 680, 684 n.5 (1983).

"The question of whether a duty exists is purely a question of law." *Brown v. Com. Dep't of Transp.*, 11 A.3d 1054, 1056 (Pa. Commw. Ct. 2011). Section 323 of the Second Restatement is one potential source of a duty in tort that Pennsylvania courts have adopted. *Morena*, 462 A.2d at 684. Because it requires the defendant to assume an undertaking, § 323 was referred to in early decisions as

the "Good Samaritan" provision. *Filter v. McCabe*, 733 A.2d 1274, 1277 (Pa. Super. Ct. 1999). Although it may apply to private transactions for consideration, at its core, § 323 "envisions the assistance of a private person . . . to a person in need of aid." *Id.* It provides as follows:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
>
>> (a)     his failure to exercise such care increases the risk of such harm, or
>>
>> (b)     the harm is suffered because of the other's reliance upon the undertaking.

Section 323 "does not . . . change the burden of a plaintiff to establish the underlying elements of an action in negligence, nor can it be invoked to create a duty where one does not exist." *Morena*, 462 A.2d at 684. Moreover, "it is incumbent upon a moving party to establish the requisite knowledge . . . before a breach of duty can be found." *Id.*

Section 323's application here is questionable at best. That provision requires that the defendant undertook to render a particular service to the plaintiff and that the plaintiff's injuries were caused by his reliance on the defendant's provision of that service. The only undertaking here was Anadarko's providing directions to QC Energy. Anadarko undertook to provide no further assistance to

drivers like Plaintiff's decedent. In addition, the record reflects that it was never Anadarko's practice to erect signage or lighting along its routes.[3]

Evidently, a driver could not rely upon precautionary measures that Anadarko never undertook to install. Anadarko never supplied or promised to supply flagmen and excess lighting, before removing all of those precautions from the route one night without warning. Thus, Plaintiff's suggestion that Anadarko may be held liable under § 323 for failing to supply flagmen, extra lighting, and signage must fail on this threshold ground alone.

Make no mistake either: deeming the provision of directions a legal "undertaking" that exposes the provider to liability anytime an accident thereafter occurs is a determination of sweeping breadth that should not be made haphazardly. When UPS or FedEx drivers rely on Google Maps to provide the most efficient route to deliver packages to rural destinations, certainly Google should not be held liable under § 323 for accurate directions when the driver is late or exits the road after missing a turn. The same is true of a consumer of pizza who dictates directions to her local Domino's delivery boy. And so too of Garmin,

---

[3] To the extent that signage or lighting was erected along the routes on which QC Energy drivers travelled, the record reflects that those precautions were installed by the state or by QC Energy, never by Anadarko. John T. Pion, Esquire, counsel for Anadarko, confirmed as much at oral argument. *See* July 2017 Tr. at 86:22–87:02 ("MR. PION: There is nothing— there is no evidence of record in this case that Anadarko installed lights or retained or used flagmen. The evidence in this record would indicate a QC independent of Anadarko did that, and Anadarko had no objection to their doing so.").

when a long-distance trucker or a vacationing family uses one of its devices to navigate the highways or the back roads.

Plaintiff's response—that this case involves "unique facts"—provides no principled way to distinguish the instant case from the above hypotheticals, and in my view, that counsels against an expansionist interpretation of § 323. Every case presents a tribunal with "unique facts." A more compelling justification than that must be proffered if years of established precedent will be tossed to the wind each time that a case involves tragic circumstances.

Indeed, nearly every court to have decided a case involving the alleged defectiveness of a GPS device has denied relief, motivated in large part by the refusal to open a floodgate of litigation every time such an accident occurs. For instance, the United States District Court for the District of Colorado granted summary judgment in favor of Garmin on a negligence claim brought by the families of deceased airline passengers. *Johnson v. Garmin Int'l, Inc.*, No. 05-CV-01565, 2009 WL 458628 (D. Colo. Feb. 24, 2009). The plaintiffs in that case alleged that a GPS device was responsible for a plane's failing to navigate a turn and crashing during its landing. *Id.* at *1. "Given the lack of available physical evidence," the court was unable to conclude that the pilots had actually followed the Garmin directions at the time of the crash or that the directions in any way contributed to the crash. *Id.* at *2. *See also Durkee v. C.H. Robinson Worldwide,*

*Inc.*, 765 F. Supp. 2d 742, 749 (W.D.N.C. 2011), *aff'd sub nom. Durkee v.*

*Geologic Sols., Inc.*, 502 F. App'x 326 (4th Cir. 2013) ("If manufacturers or

designers of products had a legal duty to third parties to anticipate improper use of

their products then . . . cellular telephones, GPS devices, and even car radios would

be the subject of suits such as this one.").

Further, to the extent that Anadarko owed the Plaintiff's decedent a duty

under § 323, as a matter of law it was a duty of reasonable care, not absolute care,

and it did not breach that duty on the facts of this case. When one undertakes to

provide directions, reasonable care requires provision of reasonably accurate

directions and nothing more. In the instant matter, it is undisputed that the

directions were accurate and that the driver himself failed to adequately follow

them. I asked Mr. Oakes at oral argument what more Anadarko could have done to

satisfy its duty in this regard: for instance, did it have to supply every driver with

GPS devices, maps, or a ride-along companion to manage the directions?

The stark reality is that each of these enhancements is the responsibility of

the driver's employer (QC Energy)—not Anadarko—just as Anadarko was not

responsible to supply the drivers with hard hats, boots, reflective vests, or other

safety gear. Importantly, Anadarko did not undertake to provide all QC Energy

drivers with the most advanced GPS technology. Rather, it supplied to QC Energy

exactly the provision it undertook supply: accurate directions to and from its

drilling sites. In that same vein, it is somewhat of a judicial oddity to hold an entity liable in negligence where the driver or his employer could have remedied any alleged shortcomings simply by conducting a search on Google Maps or a related cell phone application.

Moreover, Plaintiff cannot show that a map or a GPS device would have avoided the ultimate accident either, as she has presented no evidence whatsoever capable of explaining why her decedent missed the turn-off and crashed his truck 2.5 miles later. Rather, the scant record and Plaintiff's own allegations seem to suggest the true cause was something external and beyond Anadarko's control: brake failure, inexperience, or a combination of the two. Needless to say, maps, GPS devices, or cell phone applications would be of little use had the driver fallen asleep, become distracted, or shut those devices off, choosing instead to proceed from memory on the second trip.

Critically, Mr. Oakes conceded at oral argument that Anadarko actually had placed signage on State Route 144 after the Beech Creek Road turnoff. The signage, which was present on the night in question, indicated that Anadarko traffic had missed the turnoff and was no longer on the prescribed route:

| THE COURT: | So he misses the turn. Everybody acknowledges Mr. Garlick continued north or west on State Route 144. And does he pass any more signs there? |
|---|---|
| MR. OAKES: | And that's the question I thought I was answering before when I said I can't tell you with absolute certainty that he passed the—an Anadarko sign. My understanding is that he did. |

July 2017 Tr. at 33:16–22. Had Mr. Garlick passed any of those signs—and it seems as though he must have on the first 2.5 miles of his errant journey—then the efficacy of signage as a remedial measure is highly questionable.

This line of inquiry also hints at one that has largely been glossed over up to this point: even assuming *arguendo* that Anadarko's directions were a but-for or factual cause of the driver's missing the turn-off, it is not necessarily true that Anadarko's directions were also a proximate cause of the eventual accident. I asked Mr. Oakes about the same at oral argument:

| THE COURT: | What if Mr. Garlick missed the turn-off and crashed ten miles down the road on State Route 144. Was failure to erect a sign a proximate cause of the accident? |
|---|---|
| MR. OAKES: | Yes. If that's the reason why he missed the turn-off in the first place, yes. |
| THE COURT: | Ten miles down the road? |
| MR. OAKES: | Or 100 miles down the road. Two miles down the road. One mile down the road. If he didn't miss the turn-off, he doesn't get in the accident. |

July 2017 Tr. at 46:23–47:07.

That is a difficult response for a serious jurist to accept. One may hypothesize about scenarios in which a missed turn, a faulty GPS instruction, or a missed sign might proximately cause an accident. That would be the case, for instance, where a missing barrier or toppled "do not enter" sign led drivers immediately into a hole or off a cliff. But that is not what happened here. To the contrary, after the driver missed the turn-off by his own error, he continued to drive down a state route for nearly three miles, a state route that motorists of average skill drive each day and night.

**B.     Anadarko Is Entitled To Summary Judgment As A Matter Of Law On Plaintiff's Theory That § 323 Required It To Provide "The Safest Route Possible," Because That Theory Seeks To Impose A Duty Of Absolute Care; Is Unsupported By The Record; And Cannot Be Introduced For The First Time At Trial Without Anadarko's Consent.**

Seeming to recognize the writing on the wall, Mr. Kwass advanced an argument before our Court of Appeals suggesting that, pursuant to § 323, Anadarko owed a duty to provide "the safest route possible." That argument is flawed for a number of reasons, not the least of which, as discussed more fully below, is that Plaintiff has never pled, conducted discovery on, or advanced such a theory before that oral argument. That particular flaw is discussed in a subsequent section.

From the outset, it should be noted that Anadarko never undertook to maintain or improve the Commonwealth's roadways. Indeed, as discussed more

fully herein, decades-worth of case law makes certain that the responsibility of public roadway maintenance lies squarely with the state and not every commercial entity that uses its roadways. Anadarko only undertook to suggest a route from those roads that already existed, all with the assistance of local government actors.

Another flaw is that Anadarko never undertook to provide "the safest route possible," and any argument to the contrary by Mr. Kwass misrepresented the lower court record to the Court of Appeals. Indeed, the only reference to "the safest route possible" in the record appears at the excerpted deposition quoted above, wherein Anadarko's designee discusses selecting, in connection with local and state officials, the safest and most efficient routes from amongst all existing routes. *See* Lorson Dep., at 80:07–10 (Anadarko "would work with any local or municipal stakeholders to determine the most efficient and safest route into a facility.").

Neither Anadarko nor its counsel have ever admitted that the alleged duty here extended beyond selecting adequate routes from those that already existed. Any rhetorical aggrandizement by Plaintiff's counsel that pulled this comment out of context was, in my view, an effort to lead the Third Circuit down the garden path. Seeming to recognize my discontent over this stratagem, Mr. Oakes conceded the following at oral argument:

| THE COURT: | What I'm asking is, is it a duty of reasonable care or a duty of absolute care? |
|---|---|
| MR. OAKES: | It's a duty of reasonable care to provide the safest route. |
| THE COURT: | It's a duty of reasonable care? Is that what you said? |
| MR. OAKES: | Yes. |

July 2017 Tr. at 61:16–22.

What's more, a suggestion that Anadarko had a duty to provide QC Energy's drivers with "the safest route possible" conflates established principles of negligence and strict liability by imposing a duty of absolute—rather than reasonable—care. Nevertheless, were this Court to impose a duty of absolute care, the "safest" kind of care, not only should Anadarko be stationing flagmen on rural roads in the dead of night, but there would be no meaningful way to distinguish between flagmen and, for example, the provision of lightning strike preparedness kits or bear spray. So too would Anadarko need to hire its own private police force to safeguard every route from drunk drivers. And, of course, Anadarko would be required to erect guardrails and excavate new, more direct roads, among other precautions, all en route to its 48 different well pads, which included approximately 194 turns. *See* ECF No. 129 at 9. Our law does not impose a duty of absolute care and plainly that abstention is for good reason.

I note too that Federal Rule of Civil Procedure 15(b)(2) provides that "an issue not raised by the pleadings" may not be tried absent "the parties' express or implied consent." The "primary consideration" in determining whether leave to amend should be granted under that rule is whether the opposing party would be prejudiced by amendment. *Evans Prod. Co. v. W. Am. Ins. Co.*, 736 F.2d 920, 924 (3d Cir. 1984). "The principal test for prejudice in such situations is whether the opposing party was denied a fair opportunity to defend and to offer additional evidence on that different theory." *Id.*[4]

Plaintiff has never pled or presented to this Court at any time the argument that Anadarko was required to provide "the safest route possible." I would have rejected that argument long ago. In a Third Circuit exchange with the late Honorable Franklin S. Van Antwerpen, Plaintiff's counsel conceded at oral argument that his complaint was deficient in this regard:

---

[4]   *See also Lee v. Certainteed Corp.*, 123 F. Supp. 3d 780, 794 (E.D.N.C. 2015) ("Accordingly, a case may not proceed to trial on 'an unpleaded theory of recovery' without 'express or implied consent of the parties.' *Pinkley, Inc. v. City of Frederick, Md.,* 191 F.3d 394, 401 (4th Cir.1999); *McLeod v. Stevens,* 617 F.2d 1038, 1040 (4th Cir.1980). Further, 'a court will not imply consent to try a claim merely because evidence relevant to a properly pleaded issue incidentally tends to establish an unpleaded claim.'"); *Evans v. McDonald's Corp.*, 936 F.2d 1087, 1090–91 (10th Cir. 1991) (introduction of new claim at trial improper where "a late shift in the thrust of the case" would "prejudice the other party in maintaining his defense upon the merits"); *Wilson v. Muckala*, 303 F.3d 1207, 1215–16 (10th Cir. 2002) ("[W]e do not normally expect to see claims or defenses not contained in the pleadings appearing for the first time in the pretrial order, especially in such cursory form. Such a practice deprives one's adversary of fair notice, possibly discovery, and the opportunity for motion practice, and is subject to abuse by those who employ a sporting theory of justice.").

| | |
|---|---|
| J. VAN ANTWERPEN: | Counsel for Anadarko has just said that your complaint did not include anything beyond the specific requirement for signage and lighting. There was no general allegation sufficiently broad to include the laying out of a safe route, and the duty and so forth. What do you say to that, sir? |
| MR. KWASS: | We ought not, Your Honor, confuse two issues: the pleading of a duty with the pleading of allegations of negligence. In federal court, I believe that this is a notice pleading area even if we were doing— |
| J. VAN ANTWERPEN: | Well, it used to be. It's gotten a little more specific lately, but you're saying under your allegations of negligence in your complaint that you have included statements about the obligation to provide a safe route? Is that what you're saying? |
| MR. KWASS: | No, Your Honor. I don't want to mislead the court in that way. What I am saying is— |
| J. VAN ANTWERPEN: | Is it in your complaint or not? |
| MR. KWASS: | The answer is no, but it doesn't belong in the complaint. What's in the complaint are allegations of negligence. The negligence allegations here are still failure to provide lighting, failure to provide signage. The duty from which those negligence allegations arise is the broader duty to which Anadarko has committed, that it endeavored to select the safest route possible. It then put that— |
| J. VAN ANTWERPEN: | Well, how does your complaint put on the—put notice to the other party, Anadarko, that that's what you were relying on? |
| MR. KWASS: | I am not aware of any obligation under Pennsylvania law, Your Honor, to specify the duty in the complaint. What we do in the complaint is to specify operative facts and then— |

J. VAN ANTWERPEN: Did you plead the factually matter in your complaint, that they did not provide a safe route or was it limited everywhere to the specific obligation to provide signs and lighting?

MR. KWASS: The allegations of negligence in the complaint, your honor, refer to lighting and signage. There is no broad-based allegation of negligence that says failure to provide a safe route to the best of my knowledge.[5]

Although one may hypothesize scenarios in which novel legal theories are sufficiently close to the factual allegations contained within the operative pleadings such that the opposing party will not suffer prejudice, this is not that case. Quite the contrary, counsel for Plaintiff's eleventh-hour change of heart comes at the twilight of a matter in which all prior discovery, factfinding, argumentation, and legal determinations were focused on Anadarko's duty to erect signage and lighting alongside the subject state road. Consequently, given the absence of meaningful discovery, the case cannot proceed to a jury on this theory.

Plaintiff has not moved to amend its pleadings (assuming for the sake of argument that consideration of such a late amendment would even be appropriate), and Anadarko has certainly not consented to this new theory of the case. Accordingly, because Plaintiff has never conducted discovery on this theory or presented any supporting evidence at this stage, summary judgment is warranted in Anadarko's favor due to this procedural shortcoming alone.

---

[5] Tr. of Third Circuit Oral Arg. at 30:30–32:47.

**C.** **Anadarko Is Entitled To Summary Judgment As A Matter Of Law Because Plaintiff's Negligence Claim Would Fail Against The State And Local Municipalities, And Pennsylvania Law Does Not Impose A Higher Burden On Private Entities To Maintain Public Roads.**

That the installation of flagmen, lighting, signage, and guardrails on Anadarko's part would be unreasonable is enough to grant summary judgment. Nevertheless, Pennsylvania courts have addressed the duty of a municipality or quasi-municipal entity to take preventative measures time and time again. As the Supreme Court of Pennsylvania explained in *Starr v. Veneziano*, 747 A.2d 867, 873 (Pa. 2000), liability for failing to install a traffic control device, such as a sign or a light, can only lie where: (1) the municipality had actual or constructive notice of the dangerous condition that caused the plaintiff's injuries; (2) the pertinent device would have constituted an appropriate remedial measure; and (3) the municipality's authority was such that it can fairly be charged with the failure to install the device. None of these factors are satisfied here.

Anadarko had no notice that the lack of a sign at the given intersection constituted a dangerous condition. As a matter of fact, it is uncontroverted that prior to the accident, Anadarko had not received a single complaint about the intersection, even though hundreds of deliveries had previously followed that same path. *See* ECF Nos. 126 & 128-3 at ¶ 18; ECF No. 127 at 17. As both parties are well aware by now, even Mr. Garlick had driven the route successfully once prior

that very night. In furnishing suggested routes, Anadarko did not guarantee absolute safety of each of the 194 turns on public roadways that their suppliers' drivers would travel. Our negligence law does not require as much.

Further, Plaintiff's contention that signage would be an adequate remedial measure is equally unsupported by the undisputed facts. Importantly, as excerpted above, Mr. Oakes conceded at oral argument that Anadarko actually had placed signage on State Route 144 after the Beech Creek Road turnoff. The signage, which was present on the night in question, indicated that Anadarko traffic had missed the turnoff and was no longer on the prescribed route. Because the driver likely passed some of those precautionary notices, the efficacy of that signage was apparently not an adequate remedial measure.

Neither did Anadarko control either of the subject roadways—State Route 144 or Beech Creek Road. After all, Anadarko is not PennDOT. Should a large pothole on either road have opened, it would have been the state's job to patch it, not Anadarko's. Should a harsh winter snowstorm have rendered either of them impassible, it would have been the state's role to clear it, not Anadarko's. And should drivers complain that speeders abused either road, it would have been the state's job to patrol it, not Anadarko's. If a tree or other brush blocked either of the roadways after a windy storm, so too would the state need to dismantle and remove it. If the roads wound too closely to steep hills, the state should install guardrails

(as they did here). And if an inordinate number of accidents occurred, it would be the state's job to study it, lower the speed limit, and revise any existing signs—not Anadarko's.[6]

In such cases where the responsibility for roadway maintenance was the state's and the state's alone, Pennsylvania courts have therefore consistently held that the proper defendant in resulting negligence actions is the state itself and not a neighboring landowner, *Allen v. Mellinger*, 625 A.2d 1326, 1329 (Pa. Commw. Ct. 1993); not a nearby business owner, *Newell v. Montana W., Inc.*, 154 A.3d 819 (Pa. Super. Ct. 2017); and not even an adjoining township, *Starr*, 747 A.2d at 867. Even then, failing to erect a traffic control device, such as a sign or light, is the "outer limit" of the state's liability. *Id.* at 872.

Moreover, the Supreme Court of Pennsylvania has held that in those rare case in which a private entity or local municipality controls a road, there is "no principled basis" upon which to distinguish its responsibility to install traffic devices from the PennDOT's duty to install traffic devices on state roads. *Id.* In other words, private entities and local municipalities are not subject to heightened standards of tort liability in the context of roadway maintenance. *Id.* They are

---

[6]   Neither is it viable to suggest that business often advertise on billboards or erect signs to indicate to customers that their business are located nearby. Businesses do so not in an effort to safely maintain roadways but to advertise. Were they not to erect such signage, they could not be liable for negligence. Neither does it matter that certain establishments, such as a baseball parks, owe a duty to their patrons. That duty stems from established principles of premises liability that are wholly distinct from § 323. The inapplicability of premises liability here was already decided by this Court and affirmed by the Third Circuit.

responsible to the same extent as the state would be if it were charged with the upkeep of that same thoroughfare. *Id.*

This is an exceptionally problematic concept for Plaintiff, as the record here remains uncontroverted that the government entities who controlled the subject state route not only were familiar with the particular turn, but never recommended erecting any additional traffic control devices, lights, or signs. *See Garlick*, 636 F. App'x at 115 n.13 ("The record shows that government entities played a role in devising the directions, and there is no evidence they recommended that lights or signs be posted along the routes."). Thus, it appears that, as a matter of law, liability must be foreclosed on this ground alone, as no reasonable jury could find to the contrary. Indeed, the jury charge incorporating that footnote from the Third Circuit would dictate as much.

Plaintiff offers no persuasive legal argument as to why the national energy giant Anadarko would possess any specialized knowledge of roadway safety in Clinton County beyond what the state already enjoys. Certainly, heavy delivery trucks both connected and unconnected to the natural gas industry traversed the subject route many times in the past—in good weather and in poor, during the light of day and in the dark of night. If the state was never put on notice of an apparent design defect, then the suggestion that Anadarko should have independently detected and remedied it is highly questionable.

I asked Mr. Oakes to explain this discrepancy at oral argument:

THE COURT:       Why didn't you sue the township or the state that
                 was responsible for maintaining the roadway?

MR. OAKES:       Because it wasn't an issue of maintenance of
                 roadway.

July 2017 Tr. at 74:06–09.

Plaintiff's argument, when reduced to its core, is therefore quite remarkable: Anadarko can be sued for a roadway maintenance issue—a failure to install a remedial traffic measure, whatever terminology one might favor—for which the state that owns and maintains that same roadway simultaneously could not. In other words, were a truck driver with a heavy load or a vehicle full of high school children to miss the Beech Creek Road turn-off and go careening down an embankment tomorrow, their estates would be left penniless—and the legal distinction would be that Anadarko never supplied those drivers with directions. That simply cannot be. Either a roadway is negligently designed and maintained at the fault of the state or it is not. Enterprising litigants may not turn to private actors who use those nearby public roads to seek compensation when those valid channels are foreclosed.

Although the question of whether a duty in tort was breached is typically a jury question, it nevertheless "may be removed from consideration by a jury and decided as a matter of law when the case is free from doubt and there is no

- 32 -

possibility that a reasonable jury could find negligence." *Truax v. Roulhac*, 26 A.3d 991 (Pa. Super. Ct. 2015) (Mundy, J.). Even assuming that some sort of quasi-municipal tort duty should be imputed to Anadarko, the elements of such liability would not be met here, because Anadarko did not breach a duty of reasonable care as a matter of law. No reasonable jury could find otherwise. Indeed, the jury instructions with which I would be required to charge them would facially disallow such a finding. Thus, because no viable jury instructions can harmonize settled Pennsylvania law and Plaintiff's theory of the case, summary judgment will be granted in favor of Anadarko.

> **D.** **Anadarko Is Also Entitled To Summary Judgment As A Matter Of Law Because A Driver Who Cannot Show Why His Vehicle Left A Prescribed Route And Eventually Crashed Has Failed To Establish Proximate Causation.**

In addition to the above shortcomings, Plaintiff's claim also fails as a matter of law because she has not adduced sufficient evidence as to proximate causation. In particular, Pennsylvania law is replete with examples of cases where plaintiffs seek to hold the governmental entities liable for accidents in which a vehicle allegedly would not have left a nearby roadway were it for some extra safety precaution. That body of law makes clear that liability is inappropriate where the plaintiff cannot demonstrate that the absence of the alleged remedial measure caused the vehicle to leave the roadway.

No one knows why Mr. Garlick's truck missed the designated Beech Creek Road turnoff and ultimately left State Route 144. As Anadarko aptly hypothesizes, he may have grown tired on the graveyard shift and fallen asleep at the wheel; he may have taken the turn too fast to adequately negotiate it; he may have become distracted by the radio, the heat, the windshield wipers, or his high beams; he may have gotten lost in the fog; he may have swerved to miss an oncoming vehicle or animal; he may have miscalculated the distance that he had to travel; he may have stopped following the provided directions altogether; he may have made a mistake attributable to his inexperience; his vehicle may have malfunctioned; he may have been eating a snack or drinking a coffee; he may have lost focus and become distracted; or he may even have intentionally driven his truck off a cliff. Because Plaintiff has proffered no evidence tending to show that any one cause is more likely than the next, her lawsuit must cease on this independent ground alone.

In negligence cases brought pursuant to Pennsylvania law, an all-causes-possible, no-causes-probable approach is insufficient as a matter of law. This principle is well established in matters involving allegations of unsafe roadways. A recent leading example is a decision of the Commonwealth Court of Pennsylvania in *Fagan v. Dep't of Transportation*, 946 A.2d 1123, 1124 (Pa. Commw. Ct. 2008). The facts underlying *Fagan* transpired when a vehicle left the roadway in the area of a sharp left turn at 1:20 in the morning. *Id.* The vehicle stuck a

guardrail, became airborne, and collided with a utility pole and two trees, killing both passengers. *Id.*

The passengers' estates sued PennDOT, alleging that the state failed to properly maintain the gravel shoulder and the guardrail in a manner that would have warned the driver of the upcoming turn and prevented his vehicle from leaving the roadway. *Id.* at 1125. As here, the complaint in *Fagan* contended that the shoulder and the guardrail therefore constituted dangerous conditions that "triggered loss of control over the vehicle." *Id.*

The Court of Common Pleas of Cambria County granted summary judgment in favor of PennDOT as a matter of law, and the Commonwealth Court affirmed. *Id.* at 1129. Plaintiffs argued that their negligence claims should survive because the shoulder of the road and the guardrail were unreasonably dangerous for their "intended uses." *Id.* at 1126. The Commonwealth Court disagreed, holding that such a theory was insufficient to satisfy the burden to prove "a causal connection" between PennDOT's omissions and the eventual injury. *Id.*

The Commonwealth Court in *Fagan* relied upon its earlier decision in *Martinowski v. Com., Dep't of Transportation*, 916 A.2d 717 (Pa. Commw. Ct. 2006). The driver in *Martinowski* could not recall what caused him to leave the prescribed route. *Id.* at 720. The Commonwealth Court held that she therefore

could not, as a matter of law, recover for the injuries sustained when she eventually came in contact with a nearby guardrail. *Id.* at 724–25.

Just as in *Fagan*, the court in *Martinowski* relied on a number of Pennsylvania cases that foreclosed liability where evidence of causation amounted to nothing more than speculation and circumstantial inferences. Those cases make clear that where the plaintiff offers no evidence as to why the driver left the roadway in the first place, an inference of causation regarding negligently maintained road signs cannot be justified. *Id.* at 721. In such cases, courts must disregard "the seriousness of the resultant injuries" and "the dangerousness of the condition," until the plaintiff remedies its "*foundational failure* to establish the requisite element of causation of the accident." *Id.* (emphasis added).

A relevant case upon which the Commonwealth Court relied in both *Fagan* and *Martinowsk* was *Fritz v. Glen Mills Sch.*, 894 A.2d 172 (Pa. Commw. Ct. 2006). In *Fritz*, a pizza delivery driver's vehicle left the roadway after making a sharp left turn, struck a tree, and rolled down an embankment. *Id.* at 173. The driver suggested that his employer pressured him to make timely deliveries in quick succession. *Id.* The Commonwealth Court concluded that the driver had provided no credible reason as to why his vehicle left the prescribed route and struck the tree. Accordingly, there was insufficient evidence to justify an inference of causation regarding the state's maintenance of the roadway. *Id.* at 177.

The same is true of cases where the complained-of defect is a missing light or sign, rather than dangerous shoulder conditions. In *Snyder v. Harmon*, 562 A.2d 307 (Pa. 1989), the Supreme Court of Pennsylvania reversed a decision by the Commonwealth Court that denied summary judgment on a negligent roadway maintenance claim. The plaintiff in *Snyder* fell into a strip mine adjacent to a state route when he exited his vehicle to relieve himself. *Id.* at 308. He alleged that PennDOT had failed to adequately warn passing drivers of the dangers by not installing lights or similar warning signs. *Id.* at 309. The Supreme Court reversed the Commonwealth Court's denial of PennDOT's motion for summary judgment, reasoning in part that "the absence of lighting so as to create a deceptive appearance of the shoulder of the road cannot be said to be either an artificial condition or a defect of the land itself." *Id.* at 312–13.

A similar result was reached in *Bruce v. Com., Dep't of Transportation*, 588 A.2d 974 (Pa. Commw. Ct. 1991). The plaintiff in *Bruce* drove his motorcycle into an intersection between a township road and a state route. *Id.* at 976. A stop sign was missing from the intersection on the date of the accident. *Id.* The township moved for summary judgment, contending that it was not responsible either for the missing sign or for overgrown vegetation alongside the intersection. *Id.* The Commonwealth Court granted the township's motion, reasoning that the township had no obligation to replace a stop sign erected by PennDOT or to erect additional

signs warning motorists that they were approaching an intersection. *Id.* at 978. To the contrary, "these facts would not create a duty on the part of the Township to keep the intersection clear of obstructions to sight which are on the property of others." *Id.* at 979.

Proximate cause analysis is the same regardless of whether sovereign immunity applies. In fact, the Supreme Court of Pennsylvania has explicitly recognized that interpretation of the sovereign immunity statute is "consistent" with the "normal" negligence law's examination of proximate cause. *Dean v. Com., Dep't of Transp.*, 751 A.2d 1130, 1131 (Pa. 2000). *See also Mascaro v. Youth Study Ctr.*, 523 A.2d 1118, 1124 (Pa. 1987) (explaining that the Commonwealth Court has "consistently held" that liability imposed on a political subdivision is "no greater than that of a private landowner"); *Mindala v. Am. Motors Corp.*, 543 A.2d 520, 527 (Pa. 1988) (liability for missing stop sign appropriate only where township "had knowledge of a dangerous situation" and "the capability to rectify the problem"); *See also Wenger v. W. Pennsbro Twp.*, 868 A.2d 638, 643 (Pa. Commw. Ct. 2005) ("The remaining element of Plaintiff's burden is to demonstrate that the proposed traffic device would have constituted an 'appropriate' remedial measure.").

The core inquiry in traffic cases—whether there is "a causal connection" between the defendant's omission and the eventual injury—remains the same

regardless of the defendant's identity. As the Supreme Court of Pennsylvania made explicit in *Mascaro*, liability for negligently maintaining a roadway will lie only "where it is alleged that the artificial condition or defect of the land *itself* causes the injury, not merely when it facilitates the injury by the acts of others." 523 A.2d at 1124.

All of the above cases involved some allegation that a roadway was negligently maintained, either that lights or signs were missing, guardrails were defective, or the shoulders too dangerous. And all of those cases shared an important facet: the cause of the accident, as here, was unknown. In fact, the matter *sub judice* arguably presents a more damning causal conundrum for Plaintiffs. Not only is the cause of Mr. Garlick's missing the turn-off unknown and leaving the prescribed route unknown, but so too is the cause of his eventual crash a mystery. Moreover, the causal analysis here is permeated with issues of driver inexperience, brake failure, and any other number of potential superseding events.

Because a reasonable jury viewing the facts presented above could not conclude that the absence of signage was the reason that the driver failed to stay on the prescribed route and crashed at a sharp turn, summary judgment is also warranted on this independent ground.

> **E.     Anadarko Is Entitled To Summary Judgment As A Matter Of Law Because Circumstances Merely Consistent With Liability Are, Without More, Insufficient To Establish Proximate Causation.**

The above line of traffic cases stems from a well-settled principle of general Pennsylvania negligence law: circumstances merely consistent with liability are, without more, insufficient to establish proximate cause. "Proximate causation is a necessary element in proving a tort case under theories of strict liability or negligence." *Van Buskirk v. Carey Canadian Mines, Ltd.*, 760 F.2d 481, 492 (3d Cir. 1985) (Adams, J.) (citing *Sherk v. Daisy-Heddon,* 450 A.2d 615, 617 (Pa. 1982). Accordingly, the causal inquiry is "inescapable" in negligence cases where subsequent actors behave in ways unanticipated by earlier ones, thereby increasing the risk of injury independent of the defendant's earlier actions. *Van Buskirk*, 760 F.2d at 495 n.11.

"A proximate, or legal cause, is defined as a substantial contributing factor in bringing about the harm in question." *Van Buskirk*, 760 F.2d at 492. "Pennsylvania courts utilize the 'substantial factor' test from the Restatement (Second) of Torts to ascertain proximate cause." *Heeter v. Honeywell Int'l, Inc.*, 195 F. Supp. 3d 753, 758 (E.D. Pa. 2016), *aff'd* 2017 WL 3128488 (3d Cir. July 24, 2017). "The following considerations are deemed important under the Restatement's 'substantial factor' test to determine proximate cause: (1) the number of factors other than the actor's conduct that contributed to producing the harm and the extent of their contribution; (2) whether the actor's conduct created a force or series of forces that were in continuous and active operation up to the time

of the harm, or created a situation harmless unless acted upon by other forces for which the actor is not responsible; and (3) the lapse of time between the actor's conduct and the harm." *Id.* at 759. "The questions of proximate cause and superseding cause are intended to further the same ultimate inquiry: how far should legal responsibility extend?" *Van Buskirk*, 760 F.2d at 495.

"[N]othing precludes a court from determining proximate cause as a matter of law if a jury could not reasonably differ on the issue." *Chetty Holdings Inc. v. NorthMarq Capital, LLC*, 556 F. App'x 118, 121 (3d Cir. 2014) (Fisher, J.) "To put it another way, where there is no issue of fact, the issue of proximate cause is one for the court to determine as a matter of law." *Heeter*, 195 F. Supp. 3d at 758. While every case turns on its facts, Plaintiff's evidence does not create a genuine dispute of material fact warranting the denial of summary judgment here.

Recently, in *Sikkelee v. AVCO Corp.*, — F. Supp. 3d —, No. 4:07-CV-00886, 2017 WL 3317545 (M.D. Pa. Aug. 3, 2017), I held that proximate cause was destroyed where an aftermarket entity departed from the original manufacturer's directions and best practices in a manner unanticipated by the original issuer of the instructions. *Id.* at *42. Indeed, the directions provided by Anadarko here were even more detailed than those provided in *Sikkelee*, making it increasingly likely that deviations were the fault of the end-user and not Anadarko. *Id.* at *40. So too does *Sikkelee* stand for the proposition that liability may become

too attenuated or an alleged omission less substantial when subsequent actions or defects introduced by other actors, such as inexperience or brake failure, arguably contributed to the ultimate injury.

*Sikkelee* flows from a line of established Third Circuit case law. For instance, in *Fedorczyk v. Caribbean Cruise Lines, Ltd.*, 82 F.3d 69 (3d Cir. 1996) (Cowen, J.), our Court of Appeals affirmed a grant of summary judgment in a bathtub slip-and-fall case. The plaintiff in *Fedorczyk* claimed that the defendant cruise line was negligent for not having a sufficiently large non-slip surface on the floor of the tub. *Id.* at 72. The Third Circuit held that because the plaintiff could not show that it was the lack of a non-slip surface that actually caused her fall, the negligence claim must fail. *Id.* at 74–75. "The possibility of the existence of an event does not tend to prove its probability," the Court of Appeals wrote. *Id.* at 75. Instead it was "speculative to conclude" that inadequate flooring caused the injury "when no evidence in the record indicates where [she] was standing." *Id.*

Relatedly, the plaintiff's decedent in *Butts v. Weisz*, 410 F. App'x 470 (3d Cir. 2010), died from blunt head trauma after falling down the basement stairwell at a friend's home. "No one saw [his] fall." *Id.* at 471. The plaintiff sued the homeowners, alleging her husband's fall was caused by dim lighting and narrow steps. *Id.* Citing *Fedorczyk*, the Third Circuit affirmed the district court's grant of summary judgment and reasoned as follows:

> As the District Court recognized, the expert's testimony as to the cause of Mr. Butts' fall was speculative and unreliable because no one witnessed the fall. The existence of dim lighting conditions and the allegedly dangerous single step does not, in and of itself, reasonably suggest that the fall was caused by the negligence of Mr. and Mrs. Weisz.

*Id.* at 472. Indeed, the Third Circuit in *Butts* took into account that, as here, the decedent "had successfully navigated that step numerous times in the hours preceding his fall." *Id.*

Accordingly, because the Plaintiff here has failed to adduce sufficient facts establishing proximate causation as a matter of law and because unbridled speculation from circumstances merely consistent with proximate causation is insufficient, Anadarko is entitled to summary judgment on this ground.

## IV.   CONCLUSION

"It is unquestioned that [the plaintiff] sustained serious injury, but not all instances of injury automatically lead to an award of damages. Not all accidents are the legal fault of another." *Harlan v. Frazier*, 635 F. Supp. 718, 723 (W.D. La. 1986), *aff'd*, 811 F.2d 601 (5th Cir. 1987), and *aff'd*, 811 F.2d 601 (5th Cir. 1987).

Moreover, the decedent's family is not left emptyhanded. Quite the contrary, they should have obtained all applicable relief under Pennsylvania's Worker's Compensation Act. In other words, the system here worked precisely as it was intended to.

Any ruling to the contrary would amount to nothing less than my legislating from the bench and rejecting decades of established precedent, all because this case presents tragic facts. My sympathies are with the decedent's family, but the Oath that I took forbids me from ruling as such.

An appropriate Order follows.

BY THE COURT:


*s/ Matthew W. Brann*
Matthew W. Brann
United States District Judge